NUGENT, WEINMAN, ABBENE,
ALCOCK & WOLFE, APC
  K. Todd Curry (149360)
1010 Second Ave., Suite 2200
San Diego, CA 92101
Telephone: (619) 236-1323
Facsimile:   (619) 238-0465

Attorneys for Debtor / Debtor In Possession,
North Plaza, LLC

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 04-00769-PB11 |
| NORTH PLAZA, LLC | Chapter 11 |
|     Debtor and Debtor In Possession. | DEBTOR'S ***REPLY*** MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR ORDER: (1) APPROVING SETTLEMENTS WITH SECURED CREDITORS; AND (2) AUTHORIZING PAYMENT OF SECURED CLAIMS |
| | Date:   September 21, 2005<br>Time:  10:30 a.m.<br>Dept:   Four<br>Honorable Peter W. Bowie |

/ / /

/ / /

/ / /

/ / /

/ / /

Debtor / Debtor In Possession, North Plaza, LLC (the "Debtor"),[1] respectfully submits this reply memorandum of points and authorities in support of its motion for an order approving settlements with secured creditors and authorizing payment of secured claims.

# I.

## BREE'S OBJECTIONS TO THE PROPOSED SETTLEMENTS ARE WITHOUT MERIT.

James Bree, Dorene Bree, and South Temecula Gateway, LLC (collectively, "Bree") oppose the Debtor's motion. However, instead of addressing the relevant issues, Bree filed a mound of papers and pleadings that have nothing to do with the proposed settlements. Bree's objections are without merit and do not change the Debtor's analysis, which is entitled to substantial deference, that the proposed settlements are reasonable and are in the best interests of creditors and the Debtor's bankruptcy estate.

**A.    Dynamic's Claim No. 16 (the July 1998 loan)**

Objecting to the proposed settlement of Dynamic's Claim No. 16 (which relates to the July 1998 loan for which the unpaid balance now exceeds $14.9 million), Bree asserts that: (1) William P. Johnson ("Johnson") alleged in some other litigation that broker Isaac Lei ("Lei") did not actively arrange *some other loan,* and that based on Lei's apparent role in connection with *that other loan*, Lei appeared to be an employee of Dynamic; and (2) Sabella alleges in some other litigation that she is Johnson's partner in entities other than North Plaza, LLC. Opposition at 5-6. In light of Lei's extensive explanation and documentation of his role in arranging the loan and extensions thereof that are the subject of Dynamic's Claim No. 16, and in light of the conclusive presumption that Lei arranged the loan and extensions (see the Debtor's moving papers), the Debtor does not believe there is any reasonable basis to conclude that Lei's role does not entitle Dynamic to an exemption under California's usury law.[2] The Debtor believes that Bree's position, which is that the Debtor should litigate the issue

---

[1] Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Debtor's moving papers.

[2] Whatever Lei's role was in connection with some other loan, the Dynamic loan to the Debtor, and the extensions thereof, were arranged by Lei. See the Supplemental Declaration of William P. Johnson dated September 16, 2005 ("Supplemental Johnson Declaration"), filed and served concurrently herewith, ¶ 2.

-1-

of Lei's role, would result in disaster, namely, litigation with Dynamic, Sabella, and probably the other settling secured creditors, and in the end the Debtor would be saddled with its counsel's fees, the fees of the secured creditors' counsel, no discount of the allowed amount of the settling creditors' secured claims, and an administratively insolvent estate.

As for Bree's reference to a claim by Sabella in litigation in another forum that she is Johnson's partner in projects other than North Plaza, LLC, what Sabella may assert in litigation unrelated to the Debtor's Chapter 11 case is irrelevant to whether the Debtor's proposed settlement of Dynamic's Claim No. 16 in this Chapter 11 case is reasonable, and Bree does not even attempt to explain any purported relevance.

**B.    Sabella's Claim No. 14 (the Chambers Note and Deed of Trust)**

Bree notes that Robert Chambers ("Chambers"), who is Sabella's assignor with respect to the loan that is the subject of Sabella's Claim No. 14 (which relates to the Chambers Note and Chambers Deed of Trust), is litigating with Johnson in another forum in which Johnson asserts that Chambers is owed nothing. Opposition at 3. Bree is confused, as he seems to suggest that Sabella and Chambers both are seeking payment under the Chambers Note–Sabella in the bankruptcy court and Chambers in some other court. The fact is, Chambers is not asserting any claim against the Debtor in any forum. As explained in the Debtor's moving papers, Sabella is the holder in due course of the Chambers Note and the Chambers Deed of Trust, which means that she is entitled to enforce them. The notes involved in the other litigation to which Bree refers were not signed by the Debtor (they are signed by Shining City, Inc. and/or Johnson personally), such notes were not secured by the Debtor's Real Property (they were secured by Shining City's member interest in the Debtor, which is not property of the Debtor's bankruptcy estate), and the Debtor is not even a party to that litigation. See Bree's Request For Judicial Notice, Ex. 14, at 377, 378, 379. Therefore, Bree's allegations regarding litigation between Chambers and Johnson in some other forum simply are irrelevant to any issue before this Court, and the Debtor is perplexed as to why Bree would even mention such unrelated and irrelevant litigation.

Bree also mentions a declaration of Chambers stating that he (Chambers) made no commercial loans in the 12-month period surrounding March 4, 1999. Opposition at 3. Bree's vague suggestion seems to be that the Chambers Note does not evidence a real loan because Chambers made no such

loan, and so the Debtor should pay nothing to Sabella on account of the Chambers Note. Bree's argument is absurd and irrelevant on its face, because even if Chambers made no loans during either the 12 months before or 12 months after March 4, 1999, the Chambers Note was executed January 28, 1998, which is outside the referenced period during which Chambers allegedly made no loans. See the Sabella Declaration, Ex. 16. Moreover, given that Sabella is a holder in due course of the Chambers Note and the Chambers Deed of Trust, any purported defense against Sabella based on Chamber's having made no loans during a certain period would fail as a matter of law.

**C.     Dynamic's Claim No. 15 (the $18 million cross-collateralized loan)**

With regard to Dynamic's Claim No. 15 (which is based on the $18 million cross-collateralized loan to Rancho California Country Club, LLC and was secured by one parcel of the Debtor's Real Property), Bree again complains that the Debtor has not explained Sabella's allegation in some other litigation that she is Johnson's partner in projects other than North Plaza, LLC. Opposition at 3-4, 6. For the reasons stated in Part I(A) above, this issue is not relevant, nor does Bree attempt to explain why it is relevant, to whether the Debtor's proposed settlement of Dynamic's Claim No. 15 is reasonable.

Bree alleges that the deed of trust in the Debtor's Real Property securing Dynamic's Claim No. 15 is the subject of litigation in another forum pursuant to which the parties thereto seek to cancel such deed of trust. Opposition at 2. Bree is mistaken, and his own documents prove it. First, the Debtor is not a party to those lawsuits. Second, reading the complaints, it is clear that the deeds of trust sought to be canceled are deeds of trust on property owned by Vail Lake Village and Resort, LLC ("VLVR"), not on property owned by the Debtor. See Bree's Request For Judicial Notice, Exs. 11, 12. What Bree's documents show is that the Debtor faces considerable risk, because if the deed of trust on VLVR's property is cancelled in connection with the other litigation, that would place more relative burden on the Debtor's Real Property (specifically, the sale proceeds thereof) because Dynamic will have lost some of its security for the cross-collateralized $18,000,000 loan. Thus, Bree's documents actually ***support*** the Debtor's position that the settlement of Dynamic's $18,000,000 allegedly secured claim (the outstanding balance on which presently exceeds $22,000,000) in exchange for a modest unsecured claim in the amount of $100,000 is patently reasonable in light of the risks and costs of litigation.

-3-

Bree also alleges that the Debtor failed to disclose that Dynamic's Claim No. 15 was cross-collateralized with property owned by third parties and that the doctrine of marshaling should preclude the proposed settlement. Although the Debtor did not discuss this issue in great detail in its moving papers, the Sabella Declaration states that the lien was additional collateral for a loan made to Rancho California Country Club, LLC. Sabella Declaration, ¶ 37. The proposed settlement of Dynamic's Claim No. 15 is designed to avoid costly and time consuming litigation over numerous issues (including marshaling), and to avoid the risk that some portion of the $18,000,000 lien would be treated as senior to liens held by the other creditors who have agreed to settle with the Debtor. Allowing Dynamic an unsecured claim of only $100,000 is a very modest price to pay in exchange for avoiding such costs and risks. In addition, the proposed settlement of Dynamic's Claim No. 15 must be viewed in the context of the settlements of Dynamic's Claim No. 16 and Sabella's Claim No. 14, both of which claims were reduced substantially in consideration of a global settlement with Dynamic and Sabella of all three of their claims.

Bree alleges that Johnson, Sabella, and Dynamic "squeezed out" Bree from Vail Lake USA, LLC. Opposition at 4. Even if this allegation were true, Bree fails to explain why it is relevant to whether the Debtor's proposed settlement with Dynamic is reasonable. Indeed, if Bree was "squeezed out" from Vail Lake USA, LLC, he is free to seek a remedy elsewhere against those he claims squeezed him out, but this issue does not affect the Debtor's Chapter 11 case, nor does Bree explain how it might affect the case.

Bree attacks Lei's role as broker with respect to the loan that is the subject of Dynamic's **Claim No. 15.** This attack is misplaced, and once again, Bree is confused. Lei's role as a broker is relevant to the loan that is the subject of Dynamic's **Claim No. 16,**[3] because the Debtor proposes to pay interest to Dynamic on account of **Claim No. 16** that would be usurious but for the fact that the loan was arranged by a licensed broker (Lei). However, the Debtor proposes to allow only a $100,000 unsecured claim on account of Dynamic's **Claim No. 15**, and given that the outstanding balance on Claim No. 15 presently exceeds $22,000,000 of which $18,000,000 was the original principal amount (Sabella

---

[3] Lei arranged that loan and the extensions thereof, as clearly and extensively explained and documented in the Debtor's moving papers.

-4-

Declaration, ¶¶ 37, 39), *the Debtor does not propose to pay any interest whatsoever to Dynamic on account of Claim No. 15, let alone interest in excess of the non-broker-arranged rate*. Accordingly, the Debtor has not addressed, and need not address, Lei's role as a broker in connection with the loan that is the subject of Dynamic's **Claim No. 15**.

**D.     The Suprunuks' Claim No. 7**

Opposing the settlement with the Suprunuks, Bree argues primarily that the Debtor received nothing in exchange for the Suprunuks' deed of trust. The Debtor noted in its moving papers that it received nothing in exchange for the Suprunuks' deed of trust, so this fact is neither new nor disputed. The issue, which Bree overlooks, is whether the Debtor's proposed settlement with the Suprunuks "falls within the universe of reasonable alternatives." See LeBlanc v. Salem (In re Mailman Steam Carpet Cleaning Corp.), 212 F.3d 632, 635-36 (1st Cir.), cert. denied, 531 U.S. 960 (2000).

Bree wants the Debtor to sue the Suprunuks to avoid their lien as a fraudulent transfer, but Bree mistakenly believes that mere failure of the Debtor to receive reasonably equivalent value in exchange for the Suprunuks' deed of trust is enough to avoid the deed of trust. Bree forgets that one of the requirements to avoid a fraudulent transfer is that the Debtor was insolvent at the time of the transfer or became insolvent as a result of the transfer. See Cal. Civ. Code §§ 3439.05, 3439.07(a); 11 U.S.C. § 544(b). Having forgotten this important point, Bree then side steps the crucial analysis regarding the probability of success in connection with any litigation to avoid the Suprunuks' lien. As detailed in the Debtor's moving papers, based on appraisals of the Debtor's Real Property, the Debtor believes that it faces significant risk litigating the insolvency issue with the Suprunuks.[4] That risk was a substantial

---

[4] Bree asserts evidentiary objections to the appraisals, which are attached as Exhibits 5 and 6 to the Johnson Declaration. Notably, the appraisals were prepared by the same appraiser engaged by Bree to support his motion for relief from the automatic stay. See the Declaration of Roger Doverspike in Support of South Temecula Gateway's Motion for Relief From Stay dated March 18, 2004 [Docket No. 38]. In any event, there is no rule that a debtor in possession or trustee must rely only on admissible evidence when evaluating the reasonableness of a proposed settlement, and Bree cites no such rule. The Debtor is required to act reasonably, and in evaluating the risk of litigation, the Debtor can and should take into account appraisals of its Real Property. Those appraisals, whether or not offered for the truth of the matters asserted therein, provide a reasonable basis for the Debtor's settlement with the Suprunuks, especially given the lack of any evidence whatsoever suggesting that the appraisals should not be relied upon for that purpose.

factor in the Debtor's decision to settle with the Suprunuks.[5]

Bree also argues that the Suprunuks' deed of trust is entirely void because it allegedly was not supported by any consideration whatsoever. Bree misses the mark. Although consideration is a necessary feature of any enforceable contract, the consideration required to support a contract consists of either (i) "a benefit conferred or agreed to be conferred upon the promisor *or some other person*," or (ii) "a detriment suffered or agreed to be suffered by the promisee or some other person." 1 B. Witkin, Summary of California Law, Contracts § 208 (9th ed. 1987) (emphasis added); see Cal. Civ. Code § 1605; Flojo Int'l, Inc. v. Lassleben, 4 Cal. App. 4th 713, 719-20 (1992). Here, the Suprunuks parted with $1,421,800 in exchange for and in reliance upon a deed of trust in the Debtor's Real Property. See the Johnson Declaration, ¶ 11 & Ex. 2. Thus, the Debtor's issuance of the deed of trust to the Suprunuks' was in exchange for both (i) a benefit to Johnson personally because the loan was made to him, and (ii) a detriment to the Suprunuks through their parting with cash totaling $1,421,800. Therefore, regardless of whether the Suprunuks' deed of trust is avoidable as a fraudulent transfer because the Debtor did not receive reasonably equivalent value in exchange therefor, the deed of trust is not void, because it was supported by more than adequate legal consideration.[6]

Bree suggests that there might be some other defenses to the Suprunuks' claim because some defenses were asserted in an answer filed in some other litigation. The Debtor and its bankruptcy counsel have evaluated the Suprunuks' claim and believe that the proposed settlement is reasonable taking into account strengths and weaknesses in the Debtor's position. If there are some strengths or

---

[5] Bree also suggests (without any evidentiary support) in his objections to the Johnson Declaration that the Debtor owns or owned, at some unspecified time, a $20,000,000 interest in Vail Lake USA, LLC. Assuming the Debtor owned a $20,000,000 asset at the time it granted a deed of trust to the Suprunuks, then the Debtor would have been quite solvent at that time and could not now avoid the Suprunuks' deed of trust as a fraudulent transfer; that fact, in turn, would support allowance of the Suprunuks' secured claim in an amount substantially greater than that proposed pursuant to the settlement. Thus, Bree's unsubstantiated argument actually supports the Debtor's proposed settlement with the Suprunuks.

[6] In Wigard v. Brown, 59 Cal. 194 (1881), cited by Bree, the court declared void an option to purchase real property due to, among other things, a complete lack of consideration. Id. at 197. As discussed above, legal consideration is more than sufficient in the instant case.

weaknesses that Bree believes the Debtor has overlooked in evaluating the Suprunuks' claim, and if Bree would like to support his belief with *specific facts* rather than vague allegations and unsupported accusations, the Debtor would consider such facts. To date, no such facts have been offered, and the Debtor believes that its evaluation of the Suprunuks' claim is sound and that the proposed settlement with the Suprunuks is reasonable and should be approved.

**E.      The Douglas / CFFAI Claim No. 2**

Bree's opposes the proposed settlement with Douglas / CFFAI. First, Bree asserts that the Debtor received nothing from Douglas / CFFAI's assignor, Vail Lake Village and Resort ("VLVR"), in exchange for issuing the note and deed of trust originally to VLVR. Simply, Bree is wrong. Johnson declared that VLVR loaned the Debtor the sum of $1,000,000 to pay down the Dynamic loan. Johnson Declaration, ¶ 17; see also the Supplemental Johnson Declaration, ¶ 3. Consistent with this fact, Dynamic's loan accounting reflects a $1,000,000 paydown on August 19, 2002. See the Sabella Declaration, Ex. 15. In any event, Douglas / CFFAI is the holder in due course of the note and deed of trust. In particular, Douglas / CFFAI took its note and deed of trust for value, in good faith, without notice that they were overdue (and they were not overdue), without notice of any unauthorized signature or of any alteration, without notice of any other claims thereto, and without notice of any other defenses or claims in recoupment. Reply Declaration of Clifford Douglas dated September 14, 2005 ("Douglas Reply Declaration"), filed concurrently herewith, ¶ 6; see Cal. Com. Code § 3302(a). This fact alone dispenses with Bree's argument about whether the Debtor received anything from VLVR, because a holder in due course takes free of such defenses. See Cal. Com. Code § 3305(b).

Bree also asserts that VLVR received no consideration for the assignment of the note and deed of trust to Douglas / CFFAI. Bree does not explain why this issue is relevant, and Bree cites no legal authority for the proposition that Douglas / CFFAI cannot enforce the deed of trust. In any event, it is undisputed that the deed of trust was assigned to Douglas / CFFAI. See the Johnson Declaration, ¶ 20; RJN, Ex. 20; Douglas Reply Declaration, ¶¶ 2-5. Moreover, Douglas / CFFAI is the holder in due course of, and paid $632,000 for, the note and deed of trust. Douglas Reply Declaration, ¶¶ 2, 6.

Finally, Bree argues that his deed of trust is prior to the Douglas / CFFAI deed of trust. Although this argument does not help Bree's position, Bree is wrong. Bree always knew of the Douglas

-7-

/ CFFAI deed of trust (which, at the time of its initial recording and before the assignment to Douglas / CFFAI, was held by VLVR) and Bree agreed that his deed of trust would be junior to the Douglas / CFFAI deed of trust. Supplemental Johnson Declaration, ¶ 4. In fact, Bree's own title insurance, which he purchased and which was issued the same day his deed of trust was recorded on September 23, 2002, lists the VLVR deed of trust now held by Douglass / CFFAI as an exception to title for which Bree was not to be insured. Douglas Reply Declaration, ¶ 7 & Ex. 7. Therefore, Bree's contention that he knew nothing of the Douglas / CFFAI deed of trust and never expected his deed of trust to be junior thereto is not accurate. In any event, this issue is of no consequence because, as explained in the Debtor's moving papers, neither Douglas / CFFAI nor Bree is secured to any extent given the amount of proceeds from the sale of the Debtor's Real Property, and the proposed settlement payment to Douglas / CFFAI is coming from negotiated reductions of (i.e., carve outs from) secured claims senior to the Douglas / CFFAI claim that were explicitly agreed to by the holders of such senior secured claims. Therefore, the issue of whether Bree is senior or junior to Douglas / CFFAI has no bearing on the proposed settlements.

**F.    Other Arguments Raised By Bree**

Bree asserts that the settling creditors are insiders. Opposition at 12. This assertion is without merit. None of the settling secured creditors is an "insider" as that term is defined in the Bankruptcy Code. See 11 U.S.C. § 101(31).

Bree alleges that he holds secured claims in excess of $5,257,000. Opposition at 12. Even a cursory review of Bree's claims reveals that (i) Bree has not produced even one promissory note signed by the Debtor (all of the notes were signed by Johnson personally), and (ii) of the various deeds of trust that Bree asserts secure his claims, only one was signed by the Debtor (the rest were signed by Johnson). See the Claims Docket, Claim Nos. 6, 8, 9, 10, 11, 12. In any event, Bree's claims are irrelevant to the Debtor's settlement motion because three secured claims that indisputably are senior to Bree's claim (i.e., Dynamic's Claim No. 16, Sabella's Claim No. 14, and the Suprunuks' Claim No. 7) entirely exhaust the Real Property sale proceeds, leaving Bree entirely unsecured regardless of what notes or deeds of trust he might claim to have. See 11 U.S.C. §§ 506(a), (d), 551; see also the Claim Summary / Analysis [Ex. 1 to Debtor's opening brief].

## II.

## THE OBJECTIONS BY KIP, INC.

KIP, Inc. ("KIP") objects to the proposed settlements. Although not clear, the ground for KIP's objection seems to be that KIP's money judgment lien, which was recorded October 15, 2002, allegedly relates back to the date its mechanic's lien was recorded on August 14, 2001. Indeed, based on the repeated representations of KIP's counsel that ample case law holds that KIP's judgment lien relates back to the recording of its mechanic's lien, the Debtor and other creditors agreed that KIP's claim should be settled and that KIP should be treated as a fully secured creditor because its judgment lien would be deemed to be in third priority position behind only Dynamic and Sabella. In preparing the settlement motion and intending to include therein a proposed settlement with KIP, Debtor's counsel was unable to find any authority for the proposition that when a mechanic's lien claimant chooses not to foreclose on its mechanic's lien and instead chooses to obtain a money judgment and to record a judgment lien, the judgment lien relates back to the date of recording of the mechanic's lien. Despite multiple requests to KIP's counsel for the case law that she represented supports KIP's position, and despite requests for copies of KIP's complaint and other documents, KIP's counsel did not supply that information, leaving the Debtor unable to demonstrate legal or factual grounds for a proposed settlement with KIP. Unfortunately, the cases cited in KIP's opposition, <u>Koudmani v. Ogle Enterprises, Inc.</u>, 47 Cal. App. 4th 1650 (1996), and <u>Coast Central Credit Union v. Superior Court</u>, 209 Cal. App. 3d 703 (1989), do not support KIP's position.

Based on the foregoing, although the Debtor would like to treat KIP's claim as fully secured and to pay that claim (the Debtor does not dispute the validity of KIP's claim or the amount thereof), the Debtor cannot reasonably request that the Court approve payment to KIP ahead of other unsecured creditors in violation of the priority scheme imposed by the Bankruptcy Code.[7]

///

///

///

---

[7] KIP's sixth priority judgment lien puts KIP in sixth position behind Dynamic, Sabella, Suprunuk, Douglas / CFFAI, and Bree, leaving KIP entirely unsecured.

## III.

## CONCLUSION

Not only has the Debtor analyzed extensively the legal and factual bases for the claims that it proposes to settle, but it also has presented that analysis to creditors and to the Court. The objections fail to present any legal or factual grounds for the Debtor to change its belief that the proposed settlements are reasonable and are in the best interests of creditors and the estate. Instead of presenting evidence to contradict or rebut the Debtor's evidence, the objections are replete with vague references, unsupported accusations, and misplaced allegations that are not tied to any issue relevant to the settlements or to the Debtor's Chapter 11 case. The Debtor believes that the proposed settlements are fair and reasonable taking into account, among other things, the risks, costs, and delay associated with litigation, all of which threaten to consume the estate, enrich counsel for all parties, and eliminate any significant distributions to unsecured and junior secured creditors. Therefore, the Debtor respectfully requests that the Court approve the proposed settlements with Dynamic, Sabella, the Suprunuks, and Douglas / CFFAI, and that the Court find that Real Property sale proceeds in the amount of $1,027,58 are preserved for the benefit of the Debtor's bankruptcy estate.

Dated: September **16**, 2005

NUGENT, WEINMAN, ABBENE,
ALCOCK & WOLFE, APC

By: *K. Todd Curry*
K. Todd Curry
Attorneys for Debtor / Debtor In Possession
North Plaza, LLC